**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Michael Murray,** | ) | **CASE NO. 1:09 CV 702** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Sears, Roebuck and Co.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendant.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon Motion of Defendant Sears, Roebuck and Co. for

Summary Judgment (Doc. 29).  This is an employment discrimination case. For the following

reasons, the motion is GRANTED.

<u>**Facts**</u>

Plaintiff, Michael Murray, filed this Complaint in the Lorain County Court of

Common Pleas against defendants, Sears, Roebuck & Company (hereafter, Sears or

defendant) and Guy Huggard.  Mr. Huggard died previous to the filing of the Complaint and,

therefore, Sears is the sole defendant. The case was removed by defendant to this Court on the

1

basis of diversity of citizenship.

Plaintiff was hired by Sears in 2001 at the age of 45 as a full-time commissioned appliance salesperson in defendant's Elyria store.  Plaintiff was part of the Brand Central Department.  Kenneth Watson was the Manager of the Brand Central Department Elyria store.  Watson was considered an assistant store manager. Huggard was the Store Manager. Rebecca Bostrom was the Manager for the Cleveland District (also known as District Manager or Director of Stores) consisting of eight stores which included the Elyria store.  As District Manager, Bostrom was responsible for approving terminations of all salaried employees and employees with more than five years service in that district.

An incident occurred on November 18, 2007, involving plaintiff at the Elyria store. Bostrom avers the following.  She was informed of the incident by Huggard who told her that Assistant Store Manager Terri Phillips had been training a merchandise consultation associate, Tiffany Hawes, on training technique on a Sunday at 7:00 p.m.[1]  Phillips was the assistant store manager of soft lines and was manager in charge of the store that day.  Bostrom learned that upon coming into the Brand Central Department, Phillips saw plaintiff and fellow associate, Pauline Canaday, sitting on a mattress.  Phillips informed them both that their front line appliances were not "showroom-ready" because smudges needed to be wiped off. Huggard further informed Bostrom that plaintiff was resistant to do any cleaning and

---

[1]     Phillips informed Huggard of the incident on the following day.  (Phillips depo. 45) Huggard then informed Kenneth Watson on that same day.  (Watson aff.) Although Watson learned that an investigation was ongoing, he did not participate in it.  Nor was he involved in the decision-making process regarding plaintiff's termination.  Watson was present on January 12 when Huggard informed plaintiff that he was terminated.  (*Id.*)

2

responded to Phillips with an act of disrespect similar to a salute and statement of "Heil

Hitler."  Bostrom instructed Huggard to obtain statements from everyone who participated or

witnessed the events.  She also instructed Huggard to call Sears's corporate HR consultants,

"88 Sears"[2] for additional guidance.  Subsequently, Huggard provided Bostrom with the

written statements of Terri Phillips, Tiffany Hawes, plaintiff, Pauline Canaday, and an

associate, Pearl Monroe.  Based on her review of the statements, Bostrom concluded that

plaintiff's conduct towards Phillips was disrespectful and constituted insubordination.

Bostrom considered the Hitler comment and salute to be inflammatory and totally

inappropriate.  Additionally, Huggard had only been brought to the Elyria store as a new

manager at the end of October 2007 and Phillips was also new to the store.  Bostrom would

not tolerate this type of disrespect to managerial personnel. Bostrom considered plaintiff's

actions in total, i.e., the fact that he was sitting on a mattress while "still on the clock," his

argumentative attitude in disregarding Phillips's directive to clean the appliances in the

presence of an associate manager in training, and the ultimate disrespectful act of making a

Gestapo or Nazi reference with a salute.  Bostrom believed these facts warranted termination.

Canaday was not disciplined as she ultimately relented and followed Phillips's directive to

clean the appliances.  Huggard requested the termination and Bostrom approved it.  Plaintiff

was terminated by Huggard on January 12, 2008.  Within a week or two following his

termination, Bostrom received a telephone call from plaintiff requesting his job back.  Upon

further investigation, Bostrom learned that when being escorted from the Sears store, plaintiff

---

[2]     HR Consulting Group is a part of "88 Sears," an avenue provided so that
employees and managers who desire guidance may call on HR matters.  (Pamela
Fowler aff.)

made some crude references about Phillips as being a "cunt" and commented, "I should have slugged the bitch."[3]  Consequently, no consideration was given to returning plaintiff to his position.  (Bostrom aff.)

The essence of the statements of plaintiff, Canaday, Phillips, Hawes and Monroe is as follows.

Plaintiff gave the following statement, dated November 23, 2007:

After working 6.0 hours with a severe sinus infection and headache, Pauline Canaday and I were winding up our Sunday shift.  We had closed our six registers and were waiting for the "all clear."  Pauline and I were sitting on a bed in the vacuum department.  Terry [Phillips] and Tiffany [Hawes] were walking through our department and Terry screamed, "Why are there fingerprints on this dishwasher?  And here! And here!"  Pauline and I were commanded to clean these up.  We told her to leave notice and the morning crew would dress the area up.  She yelled she would be here until 8:00 p.m. with this unfinished work we had to do.  As a manager, if this work was this obvious, it would have been prudent for her to let us know earlier in the day.  I am a 52 year old adult male who deserves to be addressed in a professional manner- not yelled at like a 6 year old who spilled his milk.  Terry kept pushing me and ranting her displeasures in a desperate moment of levity, I regretfully attempted to get her to realize how ridiculous she sounded.  She sounded like the Gestapo so I said Zieg Heil.  My hope was that she would recognize her unprofessionalism and lighten up and we could make amends and forget this incident which became exponentially worse with each passing moment.  I like working at Sears.  However, my health conditions caused me to say something I regret.  I had to take a nitro pill on the way home.

(Bostrom aff. Ex. D).

Canaday stated that upon coming into the department Phillips said in a "demeaning, condescending way" that "these fingerprints have to come off before you can go home." Canaday responded with "what do you want me to do" and then got the cleaning supplies and

---

[3]     The hand written statements of the two individuals who witnessed these remarks made by plaintiff are appended to Bostrom's affidavit.  (Bostrom aff. Exs. G and H)

started cleaning.  Plaintiff "abruptly said something that he immediately regretted."  (Bostrom aff. Ex. E).

Phillips stated that when she and Hawes went into the Brand Central area, Phillips noticed plaintiff and Canaday sitting on a mattress.  Phillips had been coaching Hawes and had explained to her Sears's standards of no fingerprints.  Hawes noticed right away all three front aisle laundry sets needed attention.  Phillips came around the corner and stated, "Come on guys these need wiped free of fingerprints."  Both plaintiff and Canaday remained seated.  Phillips repeated her instruction.  When both associates questioned her, Phillips stated that "these are our standards."  Canaday said, "Do you expect every one in this entire department to be clean?"  Phillips stated, "Yes, it should look like showroom condition all day, everyday.  Right now I would worry about the main aisles."  Both Canaday and plaintiff stated that they were not getting paid to do this.  Phillips told them that it was part of their responsibility to keep the floor in showroom condition always. Plaintiff argued that he wanted proof.  Phillips told him that she did not have time to pull his job description and responsibilities and said again, "Please just get it done."  Plaintiff then made a gesture of saluting Phillips and stated, "Yes, Hi Hitler."  Phillips immediately told plaintiff to leave.  He refused. Phillips attempted to have plaintiff escorted from the building but could not locate the appropriate help.  Canaday told plaintiff to "shut up and just do what she says."  Phillips again said, "Just get it done."  (Bostrom aff. Ex. B).

Hawes stated that Phillips had been explaining to her what she should be looking for as a seasonal lead at closing time.  They noticed fingerprints on several appliances.  Phillips spoke loudly enough for the associates to hear and said that the area is not ready all day.

When no one came over, Phillips and Hawes walked around the corner and saw Canaday and plaintiff sitting on mattresses.  Phillips told them their area was not ready for customers the next day and the fingerprints needed to be wiped off.  Both associates responded loudly and with attitudes, questioning Phillips.  Ultimately, Phillips again told plaintiff to wipe the fingerprints and "he responded with something that sounded like 'yes ma'am... hail Hitler' and walked away."  Phillips asked plaintiff to leave and go home but he refused.  Phillips was unable to contact security to escort him out.  (Bostrom aff. Ex. C).

Pearl Monroe, an associate in the vacuum department, stated that plaintiff and Canaday were ready and closed for the evening and were sitting on the beds.  Phillips told them that a few stainless steel dishwashers had to be wiped.  Monroe then heard shouting between the three, but could not remember what was said.  (Bostrom aff. Ex. F).

Plaintiff testified at deposition that on November 20, 2007, he telephoned the Sears Ethics Hotline, "88 Sears," because he "wanted this addressed."  He felt that he had been treated unfairly by someone with managerial authority, and did not feel that he would get any assistance from anyone at his store, especially since Huggard had only been there for a little over a month and he did not know him.  (pltf. depo. 60) 88 Sears consultant Kristen Voss took plaintiff's call and contemporaneously noted the following:

> The caller stated that on 11/18/07, he was working along[side] another assoc ... The caller stated that he felt ill that day.  The caller stated that they had 6 registers to close. The caller stated that Terry [Phillips], Lead, came walking into his and [Canaday's] dept with a cashier... and started screaming [at] them for having fingerprints on the appliances. The caller and [Canaday] explained to [Phillips] that they were very busy, and explained that they were tired and wanted to go home for the day.  The caller told [Phillips] that he would not be spoken to in that manner. [Phillips] continued to scream at [plaintiff.] The caller stated that he argued with [Phillips] a little bit. [Phillips] told the caller to go home.  The caller told [Phillips] that if [Canaday] would stay to clean the appliances, that he would stay to help [Canaday].  The caller and

6

[Canaday] stayed to clean/polish the appliances that had fingerprints.  The caller stated that he received a call from another assoc. ... notifying him that there is going to be a meeting tomorrow.  The caller stated that the assoc. told him that [Ken Watson] informed them that this meeting would be taking place.  The meeting is allegedly regarding the incident that occurred on Sunday, and the SC will be present.  I asked the caller if he has spoken with the SC to confirm/verify that there is a mtg. tomorrow?  No.

Guidance:  I recommended that the caller contact the SC to inquire on the information he was given about a meeting taking place tomorrow.  Explained that the SC would be able to verify if there would be a mtg. taking place, and if so- the reason for the meeting.  Explained to the caller that if it is confirmed that there will be a meeting taking place regarding Sunday's incident, then he should prepare himself for the discussion by gathering the details of the conversation.  The caller supported guidance.

(Pamela Fowler aff. Ex. A)

Bostrom avers that she was unaware that plaintiff had contacted 88 Sears concerning the incident.  (Bostrom aff.)

On November 26, 2007, Huggard contacted 88 Sears. He also spoke with Ms. Voss. In her notation of the call, Voss noted that Huggard sought to terminate plaintiff for insubordination.  Voss asked Huggard to fax the written statements that he had on file and that once she received and reviewed them she would follow up with him.  On November 28, 2007, plaintiff's 88 Sears case was reassigned to Nisha Patel as Voss had left the employ of 88 Sears.  On November 29, after reviewing the statements provided to her, Patel advised Huggard to administer a final warning of misconduct to plaintiff given that there were no prior Performance Improvement Plans administered to plaintiff whereby he would have been warned of his deficient conduct and given an opportunity to improve within a specified period of time.  On December 31, 2007, Huggard again called 88 Sears to state that the District Manager (Bostrom) had recommended termination.  Patel reaffirmed that because there were

7

no previous incidents, her recommendation stood.  But, she noted that the Store Manager has the final decision given that hourly associates with more than five years of service could only be terminated by the Store Manager with the approval of the District Manager.  Concurrence of the HR Consulting Department is not required for such a termination.  (Pamela Fowler aff.)

Huggard informed plaintiff on January 12, 2008 of his termination.  (Bostrom aff.)  Plaintiff again called 88 Sears on January 14, 2008 to inform them that he had been terminated.  (Fowler aff.)

According to Ken Watson, Manager of the Brand Central Department at the Elyria store, on January 22, 2008, Watson participated in the hiring of Stanley Maziarz, age 20.  Maziarz worked part-time for about two months.  Watson then hired Christopher Bohatka, age 20, on March 5, 2008.  He also worked part-time for about two months. Both Maziarz and Bohatka were terminated.  On May 15, 2008, Allen Graves, who was in his 60s, came to work part-time in the department.   In June 2008, Mike Singer, who was in his 50s, also came to work part-time in the department after being transferred from Arizona.  (Watson aff.)

The Complaint sets forth four claims.  Count One alleges that plaintiff's termination was in retaliation for complaining of disability discrimination and workplace harassment in violation of Ohio Revised Code § 4112.02(I).  Count Two alleges age discrimination in violation of Ohio Revised Code § 4112.14.  Count Three alleges age discrimination under Ohio Revised Code § 4112.99, which merely provides for a civil action for violation of Ohio's anti-discrimination statutes.  Count Four alleges intentional infliction of emotional distress.

This matter is now before the Court upon Motion of Defendant Sears, Roebuck and

8

Co. for Summary Judgment.

**<u>Standard of Review</u>**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562

9

(6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must

"produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53

F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence

of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57

F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the

evidence is "merely colorable" and not "significantly probative," the court may decide the

legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**<u>Discussion</u>**[4]

**(1) Retaliation**

Count One alleges that plaintiff's termination was in retaliation for complaining of

disability discrimination and workplace harassment in violation of Ohio Revised Code §

4112.02(I)**.** [5]

"Ohio law makes it unlawful to discriminate against those who oppose any unlawful

discriminatory practice, or who make a charge, or participate in any discrimination

---

[4]     Plaintiff specifically concedes that summary judgment is warranted on his
        intentional infliction of emotional distress claim and, therefore, the Court will not
        address this claim.

[5]     Defendant argues at length that plaintiff cannot demonstrate handicap
        discrimination because he cannot show he was handicapped. Plaintiff, however,
        does not allege handicap discrimination.

investigation or proceeding." *Lockett v. Marsh USA, Inc*., 2009 WL 4412326 (6th Cir.

December 03, 2009) (citing Ohio Rev.Code § 4112.02(I) ). Ohio courts rely on federal case

law and apply the *McDonnell Douglas* burden-shifting framework in reviewing wrongful

retaliation claims under Ohio law. *Id*. (citations omitted)   To establish a prima facie case of

retaliation under Ohio law, plaintiff must demonstrate that: (1) he engaged in a protected

activity, (2) defendant was aware that he engaged in that activity, (3) defendant took an

adverse employment action against him, and (4) there is a causal connection between the

protected activity and adverse action.  *Id*. (citations omitted).

   For the following reasons, plaintiff's retaliation claim fails because he cannot establish

a prima facie case.

   Most importantly, plaintiff did not engage in protected activity.  In a case applying

Ohio's retaliation statute, the Sixth Circuit recognized,

> 'In order to engage in a protected opposition activity ... a plaintiff must make an overt
> stand against suspected illegal discriminatory action.'  *Coch v. Gem Indus., Inc*., No.
> L-04-1357, 2005 WL 1414454, at *5 (Ohio Ct.App. June 17, 2005) (quoting *Comiskey
> v. Auto. Indus. Action Group*, 40 F.Supp.2d 877, 898 (E.D.Mich.1999)). 'Vague
> charges of discrimination do not invoke the protection of the law.' *Id*. '[A] vague
> charge of discrimination in an internal letter or memorandum is insufficient to
> constitute opposition to an unlawful employment practice.' *Booker v. Brown &
> Williamson Tobacco Co., Inc*., 879 F.2d 1304, 1313 (6th Cir.1989) (holding that
> complaints about ethnocism were too vague to constitute protected activity); see also
> *Fox v. Eagle Distrib. Co., Inc*., 510 F.3d 587, 592 (6th Cir.2007) (holding that the
> plaintiff's statements about suing the company were not protected where they did not
> specifically allege discriminatory employment practices).

*Lockett, supra.*  Under Title VII, "An employee has engaged in protected activity when 'he

has opposed any practice made an unlawful employment practice by this title' (the opposition

clause) or when 'he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this title' (the participation clause)." *El-Zabet v.*

*Nissan North America, Inc.*, 211 Fed.Appx. 460 (6th Cir. 2006) (citing 42 U.S.C. §

2000e-3(a)).  *See also Johnson v. Potter*, 2009 WL 368366 (W.D.Tenn. Feb. 12, 2009)

(Protected activity may include either participation in any proceeding under Title VII ... or

opposition to a practice declared discriminatory under Title VII....")

Plaintiff alleges that his termination was in retaliation for complaining of disability

discrimination and workplace harassment and he specifically asserts that he engaged in

protected activity in the following two ways:

> First, he contacted 88 Sears with regard to Phillips' conduct in harassing and
> demeaning him at a point where he told her that he was feeling ill, had chest pain and
> was sweating.  Second, he made his written statement on November 23, 2007 to
> Huggard stating that he was feeling ill and had to take a nitro pill immediately after
> leaving work, that he similarly raised the issue of his well-known, serious health
> condition of heart disease.

(Doc. 31 at 26).  As discussed below, however, there is no evidence that plaintiff called 88

Sears to report activity made unlawful by Ohio's anti-discrimination statutes, Title VII, or the

Americans with Disabilities Act. Nor was plaintiff's November 23 statement protected

opposition activity or a participation in an investigation into prohibited discriminatory

activity.

First, with regard to plaintiff's telephone call to 88 Sears on November 20, there is no

indication in the contemporaneous notation made by the 88 Sears representative that plaintiff

called to report disability discrimination.  The only reference in the notation to plaintiff's

physical condition is the sentence which states,"The caller stated that he felt ill that day."

There is no claim, however, to a medical disability or some sort of substantial impairment.

Plaintiff did not state, or even infer, that he felt that Phillips's conduct toward him had to do

with a physical handicap.  Plaintiff's call to 88 Sears did not report harassment based on a

12

disability, his sex, or another protected Title VII characteristic.  The notation of the call

makes clear that plaintiff felt harassed by Phillips, but there is no indication that the

harassment was based on a protected characteristic. Rather, it is clear that plaintiff was

insulted by the manner in which Phillips was speaking to him.  Additionally, it appears that

plaintiff's call to 88 Sears, which occurred  two days after the incident, was prompted, at least

in part, by a call plaintiff received from another associate notifying him that there was going

to be a meeting the following day regarding the incident.  In fact, the guidance offered to

plaintiff by the 88 Sears representative concerned only the issue of this possible meeting.

      Second, with regard to plaintiff's November 23 written statement prepared at

Huggard's direction, there is no indication that it was done as part of an investigation into

prohibited Title VII or ADA activity. Rather, Bostrom instructed Huggard to collect the

statements as a result of the incident which occurred on November 18.  Plaintiff contends that

the statement was part of an investigation into an unlawful discriminatory practice, or that he

took an overt stand against suspected, illegal discriminatory action.  Plaintiff asserts that it

was well-known in his department that he had heart disease. Plaintiff points to deposition

testimony that his associates knew he had heart surgery around 2004 or 2005, and that Ken

Watson knew plaintiff had previously taken FMLA leave for a heart issue.   But, Huggard and

Phillips were new to the store around the time of the November 2007 incident.  (Bostrom aff.)

There is no evidence that they knew of his heart condition, let alone a disability. Plaintiff

testified at deposition that he told Phillips that he "didn't feel well" and that the morning crew

could address the issue.  Plaintiff testified that he had tightness in his chest that day, he was

sweaty, and had a sinus headache, but that he didn't tell Phillips of his ailments.  (pltf. depo.

13

53-54) Canaday testified at deposition that she told Phillips and Hawes that plaintiff "had a quadruple bypass operation a couple years ago." (Canaday depo. 26)   Even assuming Phillips learned during the exchange on November 18 that plaintiff had a heart issue, there is nothing in plaintiff's November 23 statement complaining that Phillips was harassing him because of his heart condition.  Bostrom avers that she was not aware of any health conditions suffered by plaintiff, or of a heart condition.  (*Id.*) Again, assuming Phillips, Huggard, or Bostrom knew that plaintiff had a heart condition, plaintiff did not assert in his written statement that he was being treated in a discriminatory manner based on that condition.

Furthermore, plaintiff's November 23 statement reports, "After working 6.0 hours with a severe sinus infection and headache..."  He did not state that he felt that he was being discriminated against or harassed because of his heart disease.  Plaintiff points to that portion of his statement where he relates that he had to take "a nitro pill" on the way home.  In his brief, plaintiff contends that this "raised the issue of his well-known, serious health condition of heart disease."  Clearly, however, there is no contention in the November 23 statement that the encounter with Phillips was as a result of his heart disease.

Plaintiff asserts that he "*participated* (emphasis added) in an investigation with 88 Sears and with his upper management at Sears, first when he made his complaint to 88 Sears and then when he gave his written statement to Huggard as part of the investigation."  (Doc. 31 at 27) But, as determined herein, there was no complaint of or investigation into disability discrimination.  Plaintiff further asserts that his conduct "can be viewed as *opposition* (emphasis added) activity ... since he demonstrated that he made an overt stand against suspected, illegal discrimination... [when] he overtly stated that he was feeling ill and that he

14

had to take a nitro pill for his well-known, long-standing, serious heart condition. This overt action was made in opposition to Defendant's attempt to discipline him for alleged insubordination. Thus, Plaintiff has specifically opposed the investigation and possible sanction by overtly complaining that it was his serious health condition that was a pivotal factor in the transaction." (*Id.* 28) Again, there is no evidence that plaintiff opposed discriminatory conduct. Rather, he only opposed what he viewed as Phillips's demeaning and harassing conduct toward him.

In short, neither the 88 Sears call nor the written statement complained of suspected illegal discriminatory action or took an overt stand against it. Neither the call nor the statement mentioned discrimination or suggested the need for an investigation into discriminatory practices.

For these reasons, plaintiff did not engage in protected activity.

Next, plaintiff does not point to evidence that Huggard or Bostrom, the decision-makers, were aware that plaintiff contacted 88 Sears even assuming the 88 Sears representatives, Huggard, or Bostrom understood plaintiff's call to be charging discrimination. Bostrom specifically avers that she was not aware at the time she made her decision that plaintiff had telephoned 88 Sears. Certainly the decision-makers were aware of plaintiff's November 23 written statement. But, it was not a protected activity as it did not complain of discriminatory conduct. On this basis, plaintiff fails to establish the second element of the prima facie case as well.

Although plaintiff satisfies the third element of the prima facie case in that he suffered an adverse employment action when he was terminated, he fails to satisfy the fourth element

15

as there was no protected activity.  Because plaintiff does not demonstrate a prima facie case, summary judgment is warranted in defendant's favor on the retaliation claim.

Even assuming he had made out a prima facie case, there is no evidence of pretext. Once a prima facie showing is made, defendant must articulate a legitimate nonretaliatory reason for its action before the burden shifts back to plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation. *Harris v. Metropolitan Government of Nashville,* 594 F.3d 476 (6th Cir. 2010) (citing *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir.2009) ).

Defendant has asserted a legitimate reason for plaintiff's termination, i.e., his act of insubordination towards Phillips. Plaintiff argues that the reason is pretextual.[6] For the following reasons, this Court disagrees.

To establish pretext, a plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). "Regardless of which option is chosen, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally discriminated against him." *Simpson v. The Vanderbilt University,* 2009 WL 4981684 (6th Cir. Dec. 22, 2009) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003) (internal quotations and other citations omitted).

First, plaintiff asserts that the most compelling evidence of pretext is the fact that

---

[6]     Plaintiff presents this argument in the context of his age discrimination claim, but the Court will address it here.

Huggard and Bostrom ignored the recommendation of 88 Sears that plaintiff only receive a final warning for misconduct given that there had been no prior Performance Improvement Plan. For the following reasons, this Court disagrees.

Pamela Fowler, 88 Sears manager, testified that 88 Sears does not have the authority to terminate any employee other than those working in the 88 Sears office and that only the store manager and the district manager have the authority to terminate sales associates with more than five years of employment.  Fowler testified that 88 Sears "recommends courses of action.  The store manager is the decision maker and depending on the service, it would involve the district coach.  88 Sears is like a second set of eyes to look at things."  (Fowler depo. 92-93)

As discussed earlier, Bostrom and Huggard were the decision-makers and Bostrom explained why plaintiff's insubordinate act warranted termination.  Bostrom also averred that ten years earlier she had encountered a similar situation and while 88 Sears did not recommend termination, she concluded that termination was the proper course in order to set the tone that disrespectful behavior would not be tolerated.  (Bostrom aff.)

Notwithstanding, the 88 Sears notes show that it ultimately concurred in the decision to terminate plaintiff.  In January 2008, the 88 Sears case was reassigned to HR Consultant Michelle McMeins.  (Fowler aff.; Ex. A)  McMeins noted on January 28, 2008, that plaintiff had made "several inappropriate comments" (referenced above) and that "based on the new additional information, I support termination..."  (Fowler aff. Ex. A)

Second, plaintiff asserts that Phillips indicated at deposition that she did not feel threatened by plaintiff and she did not hear what he said when he saluted her.  Plaintiff also

17

points to Phillips's testimony that "To this day I do not know why he was dismissed from our company."  (Phillips depo. 97) Plaintiff's assertions are unavailing.

As discussed below, plaintiff misconstrues Phillips's testimony.  Additionally, plaintiff is only questioning defendant's business judgment in attempting to show that his conduct was not worthy of discharge.

Phillips testified that she was not sure exactly what words plaintiff used but that he made some reference to her of Hitler, while saluting:

A. ... He then basically did a gesture of like I was hail Hitler.

Q.  What's hail Hitler?

A.  Like the German, (indicating), saluted me.

(Phillips depo. 35) And,

A. ... I do remember him saluting me and mumbling something about Hitler, basically, like I was, you know, Hitler.

Q.  Could it have been sieg heil?

A. I don't believe it was.  I don't know.

(*Id.* 77)   Thus, while Phillips could not recall plaintiff's exact words, she remembered that the gist of the words was a reference to Hitler with a salute.

Further, while Phillips testified that she did not feel threatened by plaintiff's conduct, she did testify that she considered it to be disrespectful.  (*Id.* 77, 78)

Finally, Phillips's testimony only shows that she was not involved in the decision to terminate plaintiff and the investigatory process.  Phillips testified:

Q.  Now, did you know what investigation was conducted about this event?

A. No, I did not.

18

***

A. ... It was out of my hands, basically.  That was between Charlie [Huggard] and Ken [Watson] and whatever, you know.

***

A. ... And like I said, I don't even- didn't know what they were doing with the situation, I just kind of stepped out of it.  That's all I was told to do.

Q.  Who told you to do that?

A.  That's what we normally do.  It is not like I was asking what are you going to do with Mike Murray, I never asked anything, I never asked. It's not for me to decide what the company does.  I just do what I'm supposed to do.

***

A.  Again, I did not know why they terminated Mike Murray, I have no idea.  To this day I do not know why he was dismissed from our company.

(Phillips depo. 94-97)

By attempting to either downplay Phillips's reaction to plaintiff's conduct or show that Phillips did not believe that plaintiff's conduct warranted termination, plaintiff is only attempting to substitute his own judgment for that of defendant.  The Sixth Circuit has reiterated, "As we have oft times repeated, it is inappropriate for the judiciary to substitute its judgment for that of management." *Lockett, supra* (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir.2004), (*Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir.2000)).  All witnesses, and plaintiff himself, agreed that plaintiff made a reference to Hitler in addressing Phillips. Huggard and Bostrom considered plaintiff's conduct toward Phillips to be disrespectful and to constitute insubordination.  (Fowler and Bostrom affs.) Plaintiff has not raised an issue as to pretext by pointing to Phillips's testimony.

Third, plaintiff points to Ken Watson's deposition testimony that he was not aware of

19

any other employees that have ever been terminated for insubordination, or of any employees

terminated because of a single incident with a supervisor where there had been no previous

incidents.  (Watson depo. 29-30) Nonetheless, there is no evidence that an employee engaged

in the same sort of conduct as plaintiff, but was not terminated.

   Fourth, plaintiff faults Bostrom's investigation of the incident.  Plaintiff fails to

demonstrate pretext on this basis. Plaintiff points to Bostrom's testimony that Sears's policy

requires that an associate be interviewed as well as provide a statement before termination is

requested.  Bostrom did not interview plaintiff but only reviewed his written statement.  Even

assuming plaintiff was supposed to be interviewed, plaintiff presents no basis to show how

the outcome would have been different.  Plaintiff himself recounted in the written statement

his disrespect toward Phillips.  Plaintiff asserts in his brief that Bostrom "reviewed only the

limited, inconsistent written statements obtained by Huggard." (Doc. 31 at 11) As

demonstrated above, however, the statements were remarkably consistent showing how

Phillips instructed that the fingerprints be removed, plaintiff and Canaday argued with her,

and plaintiff saluted and made a Hitler-related remark.  Plaintiff asserts that had Bostrom

bothered to talk with the witnesses, she would have learned from Canaday that plaintiff was

not actually sitting on the mattress but that only Canaday was.  Plaintiff, however, wrote in

his own  statement that he and Canaday "were sitting on a bed in the vacuum department."

Phillips, Hawes, and Monroe stated essentially the same.  Plaintiff even testified at deposition

that he and Canaday "were sitting on a mattress in the vacuum cleaner department" when

Phillips entered the department and began screaming. (pltf. depo. 50)

   Plaintiff also asserts that Bostrom failed to consider that plaintiff had no prior

20

disciplinary actions.  Bostrom's testimony shows, however, that she considered this single action to be insubordinate and to warrant termination.

Fifth, plaintiff characterizes his "zeig heil" remark as an "isolated, stray comment" (Doc. 31 at 24), attempts to downplay its significance, and seems to assert that it was justified given Phillips's behavior toward him.  This argument is unconvincing.  Plaintiff testified,

> A.  The way [Phillips] was behaving reminded me of the way the Gestapo behaved, I felt. I did salute her and did say zeich heil[7].  It was a moment of levity.  I was hoping for her to recognize the stupidity of her behavior, for her to calm down, but she would not calm down. She just kept screaming.

(pltf. depo. 55) And,

> Q.  Why didn't you tell the [88 Sears hotline] that you had also made an offensive remark to the manager?
>
> [attorney objection]
>
> A.  I happen to be of German ancestry.  Zeich heil is not offensive.  The terminology, by translation, it just means basically a long life and victory, that's what it means. Like that is the portrayal I'm trying to transfer, that, yes, we will get it done, hurrah. It was not- all of this connotation referencing Hitler is totally out of line.
>
> Q.  So your salute and statement of zeich heil to Terry Phillips was, in effect, wishing her a long life and had no reference whatsoever to Nazi gestapo?
>
> A.  Yes, I was trying to reference the gestapo, how they behaved.  That's all.

(pltf. depo. 66-67)

Plaintiff also points to Bostrom's deposition testimony that she did not know the meaning of "zeig heil" and failed to look up its meaning.  Bostrom testified,

> Q.  Putting aside heil Hitler, okay, do you know what seig heil means?

---

[7]     The term is spelled variously in the deposition and plaintiff's brief as "zieg heil," "zeich heil," or "sieg heil."  It appears the proper spelling, as discussed below, is "sieg heil."

A.  No, not literally.  I just assumed it meant the same as heil Hitler.

Q.  You assumed that it meant the same thing as heil Hitler.

A.  Assumed it was some sort of affirmation of Hitler, meaning either an applause, a cheer, or I will do the command. ...

Q.  Would you be surprised to learn that it means to your health?

A.  I would be shocked to learn that.

Q.  And wouldn't you agree with me that normal conversational German, seig heil means to your health, or hail your health, hail to your health, that that's radically different from saying heil Hitler?

[attorney objection]

Q.  Did you know that sieg heil means hail to your health or to your health?

A.  No.  I think sieg heil is always viewed as a very inflammatory phrase.

(Bostrom depo. 280-281).

Clearly, Phillips understood the term to be disrespectful and Bostrom considered it inflammatory. Given the meaning of the term, there is no basis to conclude that its use toward Phillips was insufficient to justify the termination. It is well-understood that "sieg heil" is synonymous to Heil Hitler, especially when accompanied by the Nazi salute or Hitler salute. According to Wikipedia,

> The Nazi salute, also known as Hitler salute... was a form of salute gesture in Nazi Germany that was usually accompanied with an utterance of either Heil Hitler (literally: Hail Hitler), Heil mein Führer (Hail my leader), or Sieg Heil (Hail victory). It was adopted by the Nazi party to indicate subservience to the party's leader Adolf Hitler and to glorify the German nation and war effort. The salute became a mandatory form of social conduct for civilian and military personal. It was the embodiment of a cult of personality throughout Nazi Germany. Nowadays, the use of this form of greeting is illegal and constitutes a criminal offence in Germany and Austria.

Even plaintiff testified that he meant to convey that Phillips was acting like the Gestapo.

22

Plaintiff's attempts to show that Phillips or Bostrom did not fully understand the term are not convincing, especially given that both fully conveyed that they considered the remark and gesture to be disrespectful and an act of insubordination.

Finally, plaintiff asserts that his health status and age were the true motivation for his termination as demonstrated by Bostrom's deposition testimony that she and Huggard had previously discussed plaintiff's lack of "pep." Bostrom testified:

> Q.  And Charlie [Huggard] never told you what [plaintiff's] prior disciplinary history was before the termination, correct?
>
> A.  No.  The only thing that was discussed was just more, just attitude, you know, what Mr. Murray would bring to work in terms of being upbeat, peppy, with a nice outlook on life, that sort of thing when he came in the door versus I know [Huggard] did mention tht Mr. Murray at times was not as bright and chipper as he would want to see him.

(Bostrom depo. 83) This Court disagrees that the testimony is sufficient to infer an illegal motive.

For all these reasons, plaintiff fails to demonstrate pretext and plaintiff's retaliation claim fails.

**(2) Age**

Age discrimination claims under Ohio law generally are analyzed under the same standards as federal ADEA claims. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir.1998). To establish a prima facie case of age discrimination under the ADEA, plaintiff must show that (1) he was at least 40 years old at the time of the alleged discrimination, (2) he was subjected to an adverse employment action, (3) he was otherwise qualified for the position, and (4) he was replaced by someone outside the protected class. Defendant must then articulate its nondiscriminatory reason. "When the defendant does so,

23

the burden of production shifts back to the plaintiff to show that the defendant's proffered reason was mere pretext for intentional age discrimination. The plaintiff retains the ultimate burden of proving that 'age was the 'but-for' cause of the employer's adverse action.' "

*Harris v. Metropolitan Government of Nashville,* 594 F.3d 476 (6th Cir. 2010) (citations omitted).

The Court will assume that plaintiff establishes a prima facie case.  He fails to demonstrate pretext, however, as discussed above.

Accordingly, plaintiff's age discrimination claim fails.

**Conclusion**

For the foregoing reasons, the Motion of Defendant Sears, Roebuck and Co. for Summary Judgment is granted.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 4/7/10